1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10                             ----oo0oo----

11  UNITED STATES OF AMERICA,
                                      NO. CR. S-99-0433 WBS
12             Plaintiff,

13             v.                     ORDER RE: MOTION TO RECUSE

14  JOHN THAT LUONG,
    MINH HUYNH,
15  HOANG AI LE, and
    THONGSOUK THENG LATTANAPHOM,

16
               Defendants.
17
                               ----oo0oo----
18

19             After I have worked on this case for nine years, ruled

20  on over 200 motions, and presided over more than forty days of

21  jury trial, defendants move to disqualify me as the trial judge.

22  The grounds for the motion fall into essentially three

23  categories: (1) rulings and statements I have made in this case;

24  (2) rulings I made in other cases; and (3) the fact that I was

25  previously victim of a crime which defendants characterize as

26  similar to those charged in this case.

27                  Rulings and Statements in this Case

28             Defendant Minh Huynh complains that I (1) denied his

                                  1

1 pretrial motions, (2) intimidated him into giving up his right to

2 represent himself by calling him "stupid," (3) denied his

3 discovery motion, (4) denied him a psychiatrist, (5) rejected a

4 requested instruction, and (6) inappropriately told the jury that

5 he was responsible for the twelve-year delay in getting to trial

6 because he kept firing his lawyers.  Defendant John That Luong

7 adds the grounds that (1) I overruled his attorney's objection to

8 certain of the prosecutor's comments in closing argument and (2)

9 in ruling on his attorney's motion to withdraw after representing

10 him through two trials I suggested that he and his attorney were

11 acting in concert to obstruct the proceedings.

12          Disqualification of a district judge for bias or

13 prejudice is controlled by 28 U.S.C. § 144.  Previously, courts

14 construed section 144 to require that to be disqualifying the

15 alleged bias and prejudice must stem from an extrajudicial source

16 and result in an opinion on the merits on some basis other than

17 what the judge learned from his participation in the case.  <u>See</u>

18 <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 583 (1966); <u>see</u>

19 <u>also</u>, <u>e.g.</u>, <u>United States v. Carignan</u>, 600 F.2d 762, 763 (9th

20 Cir. 1979) ("28 U.S.C. § 144 . . . requires that the bias or

21 prejudice of the judge be twofold: (1) personal, i.e. directed

22 against the party, and (2) extra-judicial.") (citations omitted).

23 The Supreme Court, however, has now explained that the

24 "extrajudicial source" is only a factor, albeit "significant (and

25 often determinative)."  <u>Liteky v. United States</u>, 510 U.S. 540,

26 551, 555 (1994) ("The fact that an opinion held by a judge

27 derives from a source outside judicial proceedings is not a

28 necessary condition for 'bias or prejudice' recusal, since

2

1  predispositions developed during the course of a trial will

2  sometimes (albeit rarely) suffice.").

3          I did deny Minh Huynh's pretrial motions because they

4  had no merit, and I refused the jury instruction to which he

5  refers.  I do not recall denying any request for a psychiatrist,

6  but the docket sheet in this case contains 1184 entries, and it

7  is possible that over the nine year course of this litigation I

8  denied such a request.  (I do remember granting his requests to

9  be examined by a dentist and to have a doctor look into an

10  alleged abdominal problem about which he was complaining.)  Nor

11  do I recall ever telling the jury at any time before they reached

12  a verdict that Minh Huynh was responsible for the delay in

13  bringing the case to trial.  In fact he, as well as the other

14  defendants, did cause much of the delay by serially moving to

15  fire their attorneys as each of the trial dates approached, and I

16  may well have explained that to the jury <u>after</u> the trial was

17  over, because I believe they have a right to know why the wheels

18  of the justice system in which they have been asked to

19  participate appear to move so slowly.

20          I also do not recall using the word "stupid" in the

21  context of his request to represent himself pursuant to <u>Faretta</u>

22  <u>v. California</u>, 422 U.S. 806 (1975).  If I did, the record will

23  speak for itself and will properly reflect the context.  The law

24  requires me to explain the dangers and disadvantages of self-

25  representation to the defendant.  <u>Snook v. Wood</u>, 89 F.3d 605, 613

26  (9th Cir. 1996).  The benchbook which I use (*Benchbook for U.S.*

27  *District Judges*, Fifth Edition 2007) was provided by the Federal

28  Judicial Center, and suggests that in taking a <u>Faretta</u> waiver the

3

1 court should "say to the defendant something to this effect:"

2    I must advise you that in my opinion, a trained lawyer would
3    defend you far better than you could defend yourself.  I
     think it is unwise of you to try to represent yourself.  You
4    are not familiar with the law.  You are not familiar with
     court procedure.  You are not familiar with the rules of
5    evidence.  I strongly urge you not to try to represent
     yourself.

6 Id., at 7.  It is quite possible that in giving this advice I

7 used, or more likely defendant interpreted my remarks to use, the

8 word "stupid."  However, whatever I said did not intimidate Minh

9 Huynh to give up his right to self representation as he alleges,

10 because notwithstanding my admonitions he elected after the

11 Faretta colloquy to represent himself.  It was not until after he

12 was well into the trial, apparently recognizing his own

13 shortcomings as a lawyer, that he changed his mind and asked the

14 court to allow his advisory counsel to represent him for the

15 remainder of the trial.

16        Because "judicial rulings alone almost never constitute

17 a valid basis for a bias or partiality motion,"[1] I do not believe

18 that any of the above grounds are sufficient to disqualify me as

19 the trial judge in this case.

20                        Rulings in Other Cases

21        In his Reply to the government's opposition to his

22 motion, Minh Huynh refers to the sentence I imposed upon Huy Chi

23 (Jimmy) Luong in the companion case of United States v. Luong, et

24 al., Cr. No. S-96-350, which he says, without any authority, was

25 _____

26    [1]    Liteky, 510 U.S. at 545 (citation omitted); accord
United States v. Azhocar, 581 F.2d 735, 739 (9th Cir. 1978)
27 ("Adverse rulings do not constitute the requisite bias or
prejudice of § 144. . . . There is thus no merit to appellant's
28 claim of bias based on adverse rulings.") (citations omitted).

1 "30 years more than any comparable cases with the same offense

2 and characteristics."  He also attaches a newspaper article

3 referring to the sentence I imposed upon a defendant in another,

4 unrelated, case involving the death of a nine-year old Viet

5 Namese girl from a firebomb which the defendant in that case

6 threw through the window of the home in which she was sleeping.

7 (<u>United States v. Tu Minh Truong</u>, Cr. No. S-00-211.)

8            Rulings in other cases are treated the same, for

9 purposes of a motion to disqualify, as rulings in this case.  <u>See</u>

10 <u>Liteky</u>, 510 U.S. at 545, 555 ("[O]pinions formed by the judge on

11 the basis of facts introduced or events occurring in the course

12 of the current proceedings, <u>or of prior proceedings</u>, do not

13 constitute a basis for a bias or partiality motion unless they

14 display a deep-seated favoritism or antagonism that would make

15 fair judgment impossible.") (emphasis added); <u>see</u> <u>also</u> <u>Lewis v.</u>

16 <u>Tuscan Dairy Farms, Inc.</u>, 25 F.3d 1138, 1141 (2d Cir. 1994)

17 (rejecting an argument for bias that was based on the judge's

18 ruling in an unrelated case in which the judge had imprisoned the

19 defendant and held him in contempt of court).

20            I should not have to justify every sentence I have ever

21 imposed in order to defend against a charge of bias.  Suffice it

22 to say I do not believe the previous instances cited by

23 defendants are sufficient to display the kind of deep-seated

24 favoritism or antagonism that would make fair judgment

25 impossible.

26                            <u>Victim of a Crime</u>

27            The final ground urged for recusal is the fact that in

28 1997 I was the victim of an allegedly similar crime.  Initially,

1 there is a question as to how similar that crime was to the

2 crimes charged in this case.  The crimes charged here are

3 conspiracy to commit a robbery affecting interstate commerce; use

4 of a firearm during a crime of violence; and death caused by use

5 of a firearm during a crime of violence.  The facts here involved

6 a home invasion robbery with the object of torturing the

7 residents to gain access to their business.

8         In contrast, the incident involving me was not a

9 robbery affecting interstate commerce, nor did it involve the use

10 of a firearm.  It did not even involve a home invasion.  The

11 facts of that incident are summarized in the attached copy of a

12 news article which appeared in The Sacramento Bee the following

13 morning.  Two young men were attempting to burglarize my house

14 when I surprised them by coming home early.  Although it

15 techniclly turned into a robbery at that point, it was originally

16 intended as a residential burglary.  I was not beaten or

17 tortured, as were the victims in this case.  Rather, the object

18 of the offense was simply to steal my belongings from my house.

19 The two young men were eventually apprehended and charged with

20 simple residential burglary, and my recollection is that they

21 were each sentenced by a state judge to twelve months in the

22 county jail.

23         Assuming some similarity between the crimes, the more

24 important question is whether having been the victim of that

25 crime disqualifies me from presiding as the judge in this case.

26 Precedent with respect to judicial recusal when judges are

27 victims of a violent crime similar to an action before them is

28 scarce.  See Mann v. Thalacker, No. 95-3008, 1996 WL 33423405, at

6

1  *9 (N.D. Iowa Oct. 9, 1996) ("This court was unable to find any

2  case law dealing with a judge's duty to recuse when he has been a

3  victim of a crime similar to that for which the defendant is

4  being tried."); United States v. Fiat Motors of N. Am., Inc., 512

5  F. Supp. 247, 250-51 (D.D.C. 1981) (identifying reluctance to

6  recuse the judge presiding over an automobile recall case who

7  himself was a past victim of an auto accident because "no case

8  authority directly on point or similar to the situation here,

9  involving disqualification or recusal, has been found").

10         Defendants rely upon the doctrine of "implied bias,"

11  which is more commonly cited as a ground for juror

12  disqualification, and allows for "bias to be implied or presumed

13  from the 'potential for substantial emotional involvement,

14  adversely affecting impartiality,' inherent in certain

15  relationships."  Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir.

16  1990) (quoting United States v. Allsup, 566 F.2d 68, 71 (9th Cir.

17  1977)).  Courts appear willing to apply that same doctrine when

18  determining the propriety of a motion to recuse a judge.  See

19  Liteky, 510 U.S. at 552 (equating the process of weighing

20  judicial impartiality for recusal purposes with the inquiry into

21  a prospective juror's impartiality for disqualification

22  purposes); Mann, 1996 WL 33423405, at *9 ("[A]nalogous cases

23  involving challenges for cause for potential jurors are therefore

24  instructive in discerning whether a judge should recuse himself

25  in this situation.").

26         In determining whether a potential juror--who himself

27  or herself was a past victim of a similar violent crime or

28  conduct--could be challenged for bias, courts base their

7

1  decisions on considerations such as "the person's assurances of

2  objectivity, understanding of the concept of the presumption of

3  innocence and reasonable doubt, and recognition that the accused

4  in the present case had not been involved in the prior crime

5  against the juror."  Id.  Additional factors for consideration

6  that are more applicable to a recusal determination include "the

7  length of time since the victimization, the similarity of the

8  incidents, and the juror's [or judge's] lack of acquaintance with

9  the present victim."  Id.

10         A key factor in this analysis seems to be "the

11  similarity of the incidents."  See Allsup, 566 F.2d at 71 ("That

12  [people] will be prone to favor that side of a cause with which

13  they identify themselves either economically, socially, or

14  emotionally is a fundamental fact of human character." (quoting

15  Kiernan v. Van Schaik, 347 F.2d 775, 781 (3d Cir. 1965))).  The

16  Ninth Circuit has granted a new trial on the basis of a juror's

17  implied bias due to "the similarity of the incidents" at least

18  three times.

19         In Allsup, the court presumed that two prospective

20  jurors in a bank robbery trial were biased because they were

21  employed by the bank that had been robbed, though they worked at

22  a different branch.  Id. at 71-72 ("The employment relationship

23  coupled with a reasonable apprehension of violence by bank

24  robbers leads us to believe that bias of those who work for the

25  bank robbed should be presumed.").  In United States v. Eubanks,

26  591 F.2d 513 (9th Cir. 1979), a juror at a heroin distribution

27  trial was presumed biased because his sons were heroin addicts

28  who were in prison for crimes committed to obtain heroin.  Id. at

8

1 517 ("Regardless of the reason for [the juror's] nondisclosure,

2 we conclude that his sons' tragic involvement with heroin bars

3 the inference that Collins served as an impartial juror.").

4          Finally, in <u>Dyer v. Calderon</u>, 151 F.3d 970 (9th Cir.

5 1998), a Ninth Circuit en banc panel vacated a prior decision

6 partially based on the implicit bias presumed from a juror's

7 failure to disclose that her brother was killed in a similar

8 manner as the defendant had allegedly murdered the victim.  <u>Id.</u>

9 at 1982 ("After watching a number of potential jurors disclose

10 relatively minor crimes and get dismissed, [the juror] chose to

11 conceal a very major crime--the killing of her brother in a way

12 that she knew was very similar to the way [defendant] was accused

13 of killing his victims.").  <u>But see</u> <u>Tinsley v. Borg</u>, 895 F.2d

14 520, 529 (9th Cir. 1990) (no implied bias where juror at rape

15 trial once provided professional counseling services to rape

16 victims).

17          I have been able to find only four cases that dealt

18 directly with a judicial decision whether to recuse a judge

19 because he or she was once a victim of circumstances similar to

20 the matter before the bench.  Those cases are set forth in the

21 margin below.[2]  Notably, none of the judges recused themselves,

22

23          [2]    In <u>United States v. Fiat Motors of N. Am., Inc.</u>, 512 F.
Supp. 247 (D.D.C. 1981), the court held that the mere fact the
judge presiding over an action forcing an automobile distributor
24 to recall its vehicles had been involved in an automobile
accident which had eventually resulted in loss of one of his
25 legs--and additionally that he had filed a civil complaint as
result of the accident--did not show bias or raise doubts as to
26 his impartiality so as to require his recusal.  <u>Id.</u> at 250-51.
The court cautioned that
27

28          the logical extension and result of [defendant's]
          argument would require [judicial] disqualification in a

9

1

2    substantial number of other proceedings.  If, in fact, [a
     judge's] injuries and losses would cause a reasonable
3    person to question [a judge's] ability to render
     impartial judgments on questions of automobile safety and
4    defects, would it not also lead a litigant to raise
     questions about [a judge's] impartiality in any personal
5    injury litigation involving an automobile?  If the
     defendant's position were accepted, would it be proper
6    for [a judge] to preside in any trial involving a serious
     personal injury claim, whether it stems from a motor
7    vehicle collision, an aircraft disaster, an industrial
     explosion or any of an endless list of other types of
8    accidents resulting in serious personal injury?

9    Id. at 251; see also id. ("The unfortunate incident which [the
     judge] experienced several years ago is, of course, lasting in
10   nature, but it is no more lasting than some of the personal and
     background experiences of other trial judges where
11   disqualification attempts were advanced by a litigant and
     denied.").
12
          In Mann v. Thalacker, No. 95-3008, 1996 WL 33423405
13   (N.D. Iowa Oct. 9, 1996), the defendant, found guilty of
     kidnapping and attempted murder, asserted that the trial judge's
14   failure to disclose his own history of sexual abuse and therein
     recuse himself kept defendant from making a knowing, voluntary
15   waiver of his right to a jury trial.  Id. at *1.  The court held
     that, because the incident took place more than twenty years
16   prior to trial and the judge had openly spoke of the incident
     before the postconviction proceedings, no reasonable person could
17   conclude that the judge would be perceived as being partial.  Id.
     at *9 (finding that although "[t]he trial judge was himself the
18   victim of the crime of sexual abuse," because he "divulged the
     details of these acts . . . prior to the postconviction case" and
19   "these experiences happened nearly twenty years prior to
     [defendant's] trial," "[u]nder these circumstances, this court
20   does not believe that a reasonable person could conclude that the
     judge would be perceived as being disqualified under . . .
21   section 455(a)").

22        The court in United States v. Robbins, 48 M.J. 745
     (A.F. Ct. Crim. App. 1998), emphasized that "it is axiomatic
23   that, the mere fact that a [judge] has been the victim of the
     type offense with which an accused is charged, standing alone,
24   will not constitute sufficient grounds for recusal."  See id. at
     754.  The court thus delineated the following three-prong
25   standard in order to guide their recusal inquiry:

26   When the [] judge is asked to recuse himself or herself
     because he or she was the victim of a similar offense,
27   the following factors must be weighed and balanced by the
     [] judge, as follows: 1) the time frame of the offense;
28   was the [] judge victimized in the very recent past or

                              10

1   and when appealed, none of their decisions were overturned.

2          Unlike rulings or statements I may have made in this or

3   other cases, however, this final ground urged for recusal is

4   based on events that occurred outside the context of any judicial

5   function or proceeding.  Where the affidavit refers to

6   extrajudicial sources, it may be sufficient to trigger the

7   _____

8          the distant past?; 2) were the facts and surrounding
       circumstances of the crime especially egregious so as to
9      inflame one's emotions at the expense of one's judicial
       instincts when recalling the event?; and, 3) if the
10     answer to 2 is yes, would a reasonable person with
       knowledge of all of the relevant facts conclude that
11     sufficient time has passed whereby the [] judge's
       judicial instincts and temperament are no longer
       compromised?
12

13   Id. at 754.  In light of this criterion, the court held that
     there was no reasonable doubt that the judge under review, who
14   was a past victim of spousal abuse, was impartial to current
     defendant charged with spousal abuse because: (1) "the events in
15   question occurred 13 years prior to the trial," (2) "it is clear
     from the [judge's] responses that she was in no way inflamed at
16   the prospect of being confronted with an instance of spouse
     abuse," and (3) "even if she were, at some point in her past,
17   inflamed by her personal experience, [the court found] that a
     reasonable person would conclude from her answers that she has
18   put the experience behind her and moved on."  Id.; see also id.
     (commenting that "a reasonable person understands that judges are
19   not grown in, and harvested from, a sterile, idyllic existence
     frequently referred to as the 'ivory tower'"  but that "[i]n
20   fact, our national experience supports the opposite conclusion,
     which is that the average citizen, civilian or military, prefers
21   judges with real-life experiences").

22          Finally, in United States v. Zidar, 178 Fed. Appx. 673
     (9th Cir. 2006) [I have cited to this case even though it is an
23   unpublished decision because it is nevertheless helpful in the
     analysis], the Ninth Circuit concluded that despite the judge's
24   admission that two decades before the instant fraud and
     misrepresentation case she had brought an unrelated lawsuit that
25   included claims of fraud and misrepresentation, the district
     court correctly found that "[n]o reasonable person could question
26   [the judge's] impartiality in [defendant's] case merely because,
     twenty years earlier, she may have been a victim of an unrelated,
27   factually dissimilar fraud."  Id. at 678-79.  Moreover, the court
     noted that "since then[, the judge] has presided impartially over
28   'dozens' of cases involving allegations of fraud."  Id.

                                   11

1   provisions of 28 U.S.C. § 144.  See United States v. Sibla, 624

2   F.2d 864, 868 (9th Cir. 1980) ("If that affidavit is sufficient

3   on its face, the motion must be referred to another judge for a

4   determination of its merits under section 144.").

5         Even if the assigned judge does not believe the stated

6   grounds are valid, where the challenge is based on extrajudicial

7   sources, I believe the more prudent approach is to refer the

8   motion to another judge for decision.  The "institutional

9   integrity of the federal courts requires scrupulous protection of

10  public confidence in the judicial process."  United States v.

11  Bosch, 951 F.2d 1546, 1551 (9th Cir. 1991) (O'Scannlain, J.,

12  dissenting); see also See First Interstate Bank of Ariz., N.A. v.

13  Murphy, Weir & Butler, 210 F.3d 983, 985 (9th Cir. 2000)

14  ("[J]udges . . . are required to preserve the court's

15  impartiality and the appearance of impartiality.").[3]  I will

16  therefore ask the Chief Judge to refer this motion to another

17  judge for decision.

18                            Timeliness

19        Another issue which may have to be addressed by the

20  judge who decides this motion is its timeliness.  "A motion under

21  section 144 must be timely, i.e., the motion should be made at

22

23        [3]    Perhaps in an effort to avoid even meritless
    accusations about the impartiality of rulings on recusal motions,
    the Western District of Washington requires automatic referral of
24  all 28 U.S.C. § 144 recusal motions to a different judge.  See W.
    Dist. of Wash. Local R. 8(c) ("Whenever a motion to recuse due to
25  alleged bias or prejudice directed at a judge of this court is
    filed pursuant to 28 U.S.C. § 144, the clerk shall refer it to
26  the chief judge.  If the motion is directed at the chief judge,
    the clerk shall refer it to the next senior active judge.  Before
27  a ruling is made on a motion to recuse any judge, the challenged
    judge will be afforded an opportunity to review the motion papers
28  and decide whether to recuse voluntarily.").

1  the earliest possible moment after obtaining facts demonstrating

2  a basis for recusal."  <u>United States v. Bell</u>, 79 F. Supp. 2d

3  1169, 1172 (E.D. Cal. 1999) (finding that a recusal motion must

4  be filed as soon as practical because "a prompt application

5  affords the district judge an opportunity to assess the merits of

6  the application before taking any further steps that may be

7  inappropriate for the judge to take" and "avoids the risk that a

8  party is holding back a recusal application as a fall-back

9  position in the event of adverse rulings on pending matters")

10  (internal citations and quotations omitted).

11         As shown by the attached news clipping, the incident at

12  my home occurred in December of 1997.  As such, it was public

13  knowledge before the indictment in this case was filed and the

14  case assigned to me.  It appeared prominently on Page One of the

15  Metro Section, with a photograph of me.  While I cannot say with

16  certainty that all defense counsel knew of it at the time, I know

17  for certain that at least three of them did.  Thongsouk Theng

18  Lattanaphom's attorney, Jeffrey Staniels, acknowledged in court

19  at the last hearing that he saw the article, and two of the

20  attorneys for the defendants in this case actually represented

21  the young men who burglarized me in the state court proceeding.

22  Son Van Nguyen's first attorney, James Greiner, represented one

23  of the young men, and Bao Lu's first attorney, Robert Peters,

24  represented the other.  Mr. Greiner and Mr. Peters would not only

25  have been privy to the information in the news article, but had

26  to be intimately familiar with all of the details of the crime of

27  which I was the victim.

28         Although I recognize that none of those respected

13

1  attorneys are the moving force behind the instant motion, if they

2  thought there was any merit to it, they could have brought the

3  motion nine years ago.  Instead, none of the defendants or their

4  attorneys raised it for the first time until now.

5       Further, Minh Huynh, who <u>is</u> the moving force behind the

6  motion, has acknowledged in his affidavit that he personally knew

7  about the incident at my home before his trial began.  He states

8  specifically:

> Special Agent Dupre (FBI), the leading agent in this case
> had warned me, during a deal negotiation session <u>before</u>
> <u>trial</u>, that Judge Shubb was a victim of a home-invasion
> robbery, and that if I don't take the deal, Judge Shubb will
> whack me.

12  (Minh Huynh Aff., Mar. 24, 2008, ¶ 11 (emphasis added)).  Minh

13  Huynh, it must be remembered, was representing himself pro se

14  when the trial began.  He can hardly suggest that anything his

15  attorney said or did precluded him from making the motion.  Yet

16  he failed to raise this ground, or any other ground,[4] to

17  disqualify me as the trial judge at that time.

18       "It is enough to say that § 144 makes timely filing of

19  affidavits of bias and prejudice of the essence for the obvious

20  purpose of preventing their use as a device to obtain last minute

21  postponements of trial and to prevent a litigant from sampling

22  the temper of the court before deciding whether or not to file an

23  affidavit of prejudice."  <u>Peckham v. Ronrico Corp.</u>, 288 F.2d 841,

---

25       [4]   It is also clear that Minh Huynh knew about the
26  firebomb case before the trial began, because he states in his
    Reply brief that at the time of his meeting with Agent Dupre
27  before trial he was afraid I would not accept the government's
    recommendation based upon what he knew about the sentence in the
28  firebomb case.  Yet he also failed to raise that ground until
    now.

1  843 (1st Cir. 1961); see also First Nat'l Bank of Peoria v.

2  Muller, 851 F.2d 916, 919 (7th Cir. 1988) (movant waived any

3  grounds for making a recusal motion where movant knew the facts

4  at a preliminary hearing and proceeded to trial without objection

5  and raised the bias issue only after the judge's unfavorable

6  ruling).

7          At the time this case was first assigned to me, I was

8  an active judge of this court.  Under Canon 3 of the Code of

9  Conduct for United States Judges, a judge must hear and decide

10  all matters assigned to him, unless disqualified.  Thus, as much

11  of a burden as it was upon me,[5] I have conducted countless court

12  appearances, heard and decided hundreds of motions, and presided

13  over months of trial testimony with contentious objections in

14  this case.  I must admit that during all that time it never

15  crossed my mind that having been the victim of a crime in 1997

16  could have relieved me altogether of the responsibility for this

17  case.

18          Defendants seem to think I enjoy sitting in judgment on

19  them.  Nothing could be further from the truth.  This case has

20  taken up more of my time and worked more havoc with my calendar

21  than any other case I have had in the seventeen years I have been

22  on the bench.  I get no more credit for handling this case than I

23  would for any other case in which the defendants just walk into

24  court, plead guilty, and are sentenced.  Yet I have had to spend

25  hundreds of hours on it.  Hardly a day has gone by when I do not

26  worry about what motions or other procedural maneuvers the

27

28     [5]  This court has the second highest weighted caseload per
       judge of any district in the United States.

1 defendants will come up with next.  If the defendants had raised

2 my prior experience as a ground for recusal when they first could

3 have, and if it had any merit, I would have welcomed the

4 opportunity to withdraw from this case.  But they never gave me

5 that chance until now.

6                              Conclusion

7            All federal judges take an oath to "administer justice

8 without respect to persons, and do equal right to the poor and to

9 the rich. . ."  28 U.S.C § 453.  We take that oath seriously.  No

10 judge I know appreciates being charged with bias or unfairness.

11 Anyone who would seriously think that I could let this kind of

12 unrelated personal experience affect my impartiality as a judge

13 in this case doesn't understand the first thing about me or what

14 it means to be a judge.  Nevertheless, for the reasons discussed

15 above, I will defer the question of whether I am qualified to sit

16 on this case to the sound judgment of another judicial officer.

17            IT IS THEREFORE ORDERED that defendants' motion to

18 disqualify me as the trial judge in this matter is referred to

19 the Chief Judge for assignment to another judge for decision.  I

20 will not consider any of the pending motions; hear any other

21 motions, applications, or requests; sentence any of the

22 defendants; or perform any other judicial duties in this case or

23 ///

24 ///

25 ///

26 ///

27 ///

28 the related cases in Cr. No. S-96-350, Cr. No. S-99-74, Cr. No.

1  S-98-233, Cr. No. S-99-148, Cr. No. S-99-149, Civ. No. S-07-1162,

2  and Civ. No. S-07-2063 until this motion has been finally

3  resolved.  A copy of this order shall be filed in each of those

4  cases.

5  DATED:  May 2, 2008

6

7  _____
   WILLIAM B. SHUBB

8  UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

EXHIBIT A

**JUDGE CONFRONTS BURGLARS IN SOUTH LAND PARK HOME Origin** _Cynthia_

_Hubert Bee Staff Writer_ Publication Date 12/13/1997 Page B1 Section METRO Edition METRO

FINAL Dateline Corrections Memo Body Text William B. Shubb, chief judge of the U.S.

District Court in Sacramento, surprised two young burglars when he went to his South Land Park

home Friday for an early lunch.

Shubb, 59, confronted and conversed with the men before they tackled him and escaped with

some of his belongings, police said.

"The judge is not injured, except perhaps his pride a little bit," said Mike Nelson, chief deputy

U.S. marshal for the Eastern District of California.

Audrey Lee, a Sacramento police spokeswoman, said Shubb encountered the unarmed intruders

in a room off of his garage. The judge's wife was not home at the time, Nelson said.

"They sat him down, and I guess he made conversation. He said, "Don't take that; it's just a

keepsake,' " said Lee.

"I guess they took what they needed and left."

Before doing so, said Nelson, the burglars tackled Shubb and ran off. He then dialed 911.

"He may be pretty short and small, but he's tough," Nelson said of the judge. Graphic Text

William B. Shubb

Burglars tackled the federal judge and escaped with some of his belongings. Keywords

18